UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

JAMARR FOWLER,

                                                **MEMORANDUM AND ORDER**

                    *Plaintiff*,               13-CV-2372(KAM)(ST)

      -against-

CITY OF NEW YORK, et al.,

                    *Defendants*.
-------------------------------------X
**MATSUMOTO, United States District Judge:**

          On April 18, 2013, plaintiff Jamarr Fowler initiated

this action pursuant to 42 U.S.C. § 1983 against defendants the

City of New York (the "City"), the New York City Department of

Correction ("DOC"), and seven New York City DOC officers and

captains named in their individual and official capacities.

(ECF No. 1, Compl.)  The complaint asserted violations of

plaintiff's constitutional rights based on a series of alleged

physical assaults by the individual correction officers and

captains on April 21 and 22, 2010, while plaintiff was

incarcerated on Rikers Island.  (*Id.*)  By Memorandum and Order

dated December 23, 2015, this court dismissed plaintiff's claims

against the individual defendants pursuant to Federal Rule of

Civil Procedure 4(m) for failure to serve process, and granted

the City's and DOC's motion for judgment on the pleadings for

failure to state a claim, except as to plaintiff's *Monell* claim

against the City. (ECF No. 36, Order dated Dec. 23, 2015.) All
of plaintiff's claims were dismissed with prejudice except for
plaintiff's *Monell* claims against the City for careless and
reckless hiring, training, and retention of correction officers.
(*Id.*) Plaintiff was granted leave to file an Amended Complaint
solely as to this claim.

On January 15, 2016, plaintiff timely filed an Amended
Complaint against the City pursuant to 42 U.S.C. § 1983,
alleging violations of his constitutional rights based on the
City's failure to adequately train and supervise corrections
officers. (ECF No. 37, Am. Compl. ¶ 26.) On April 4, 2016, the
City filed a motion to dismiss plaintiff's Amended Complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule
12(b)(6)") for failure to state a claim. (ECF No. 43, Def. Mot.
to Dismiss.) The court subsequently denied the City's motion,
finding that plaintiff sufficiently stated a claim under *Monell*
by alleging a custom, policy, or practice. (Order at 2.)
Specifically, plaintiff alleged the City failed to adequately
train, supervise, or discipline its employees which led to a
number of brutal attacks against him, including the attacks in
April 2010 which formed the basis of this suit. (*Id.* at 10.)

The parties proceeded to discovery which appears to
have included taking depositions of plaintiff and the DOC
officers allegedly involved in the April 2010 assault on

plaintiff. (*See generally* ECF No. 72, Pl. Opp. Exs. 2-6.) Upon the close of discovery, defendant moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 63, Def. Summ. J. Mot.)

**BACKGROUND**

The parties each submitted a Statement of Undisputed Facts pursuant to Local Civil Rule 56.1, and defendant responded to plaintiff's with certain admissions. (*See* ECF No. 66, Def. 56.1 Stmt.; ECF No. 69, Pl. 56.1 Stmt.) The parties' Rule 56.1 Statements do not offer significant factual material for the court to articulate the relevant background of this case, although the court has discussed plaintiff's allegations in its previous decisions. Plaintiff's 56.1 Statement recited the employment dates of three DOC officers that escorted him to his cell at a particular facility on Rikers Island on April 22, 2010. (Pl. 56.1 Stmt. at 1-2.) Plaintiff's 56.1 Statement further stated that a battery was found in plaintiff's rectum on the same day by medical staff at Rikers Island Urgent Care. (*Id.*) Defendant only noted that the record did not clearly establish when the battery was found, but admitted that a battery was found in plaintiff's rectum. (*Id.*) Defendant's Rule 56.1 Statement states merely that plaintiff "did not take or request discovery" regarding his *Monell* claim, and that no such evidence was ever produced in the action. (Def. 56.1 Stmt.

at 1.)  These are the undisputed facts as presented by the parties.

Thus, there remain a number of factual disputes in this case.  However, for the purposes of context, the court shall recite the facts drawn from the parties' aforementioned Rule 56.1 Statements, plaintiff's deposition testimony, (ECF No. 72-2, Ex. 2, Fowler Dep.), the deposition testimony of Corrections Officers Harris and Phillips and Captains Blassingame and Smith, (Exs. 3-6), a number of letters and emails sent on behalf of plaintiff by Legal Aid Society staff in late 2007 and early 2008, and responses to these letters and emails from certain City employees, (ECF No. 72-7, Pl. Opp. Ex. 7), plaintiff's Amended Complaint, and lawsuits brought by plaintiff in New York State Court, the summonses and complaints of which were attached to plaintiff's and defendant's papers, (*see, e.g.*, ECF Nos. 72-8, 72-9, Pl. Opp. Exs. 8-9; ECF No. 65, Francola Decl., Ex. B).  For the purposes of this motion, the court construes the facts in the light most favorable to plaintiff, the non-moving party.

## I.    Summer and Fall 2007 Incidents

Sometime in August 2007 plaintiff was detained at Rikers Island at the George R. Vierno Center ("GRVC"), the setting for many of the events plaintiff alleges.  (Pl. Opp. at 3.)  Plaintiff alleges that on August 14, 2007 he was assaulted

by Captain Marcel and his ankle or foot was broken when Captain Marcel slammed plaintiff's leg in a cell door. (*Id.* at 8; Ex. 7 at 5-6.)[1]  He was left in his cell overnight, still in handcuffs, and eventually taken for medical treatment the following morning. (Ex. 7 at 5.)  Plaintiff alleges that on August 17, 2007, a sprinkler head in his cell expelled water for 40 minutes to an hour; in the resulting wet condition he slipped and hit his head on the toilet. (*Id.* at 6.)  He was left in his cell for about a day before receiving a new cast for his ankle. (*Id.*)  Then, on August 23, 2007, Fowler alleges he was extracted from his cell and forced to hop to a gurney by Captain Matthews and other corrections officers. (*Id.*)  He was then taken elsewhere and allegedly restrained to the gurney when Captain Matthews instructed someone to turn off the recording of surveillance cameras. (*Id.*)  Captain Matthews allegedly instructed unidentified officers to "rough him up," and the officers kicked and punched Fowler who sustained bruises all over his body. (*Id.*)  Rather than being brought to a medical clinic for treatment after this assault, Fowler alleges he was brought back to his cell where he was carried, dragged, and then dropped onto his chest several times. (*Id.*)

Shortly after these assaults, in November 2007, upon

---

[1]    For plaintiff's Exhibit 7, reference is made to pagination as delineated by the court's Electronic Filing System.

arriving to the GRVC, Fowler alleges he was again restrained to a gurney in the clinic vestibule, beaten and punched in the face by corrections officers, and struck with an unidentified metal object. (*Id.* at 2; Francola Decl., Ex. B at 4-5.) He required treatment at Elmhurst Hospital for a swollen eye. (*Id.*)

Employees from Legal Aid Society's Prisoner Rights' Project ("Legal Aid") sent letters and emails on Fowler's behalf regarding these alleged assaults to various City officials and individuals, including several with "nyc.gov" email addresses indicating employment by either the City's Department of Health and Mental Hygiene, the DOC, or the Board of Corrections. (*See, e.g.*, Ex. 7 at 15, 22.)

Dale Wilker, an attorney with Legal Aid, sent an email on August 27, 2007 to Dr. Maria Gbur and 17 other recipients, four or five of whom had City government email addresses, complaining of the August 13, 2007 assaults on Fowler and the subsequent lack of adequate medical attention.[2] (*Id.* at 23.) Burton Schall, a recipient of Wilker's August 27, 2007 email responded on September 19, 2007, stating that "Risk Management ha[d] investigated [Fowler's] allegations" and "found them to be unsubstantiated," though the email is unclear as to which allegations Schall refers to. (*Id.*) In a response regarding

---

[2]    Dr. Gbur's position is unclear from the face of this email, though her email address in another email includes a "health.nyc.gov" domain, associated with the City's Department of Health and Mental Hygiene. (Ex. 7 at 22.)

plaintiff's medical care sent later the same day, Schall shared with Wilker the dates of Fowler's eleven total visits to "Urgicare" and the orthopedic clinic between August 15 and September 13, 2007. (*Id.*)

Wilker apparently followed up on his August 27, 2007 email on September 17, 2007, informing the original 18 recipients and adding four additional recipients of a letter received by Fowler complaining of DOC staff's failure to transport him to certain medical appointments. (*Id.* at 25.)

On September 19, 2007, Alison Berger, a legal assistant with Legal Aid, wrote to Deputy Commissioner Richard White of the DOC's Investigations Unit. (*Id.* at 5-6.) This letter complained on Fowler's behalf of the alleged August 2007 assaults, and requested the DOC "take the steps necessary to properly investigate Mr. Fowler's allegations," and inform Berger of the results of the investigation. (*Id.*)

Berger also wrote to Dr. Gbur in November 2007, referring to the alleged August 2007 assaults to request an investigation into Fowler's unmet medical needs, particularly his need for a wheelchair. (*Id.* at 2-3.) Berger also emailed this letter to Dr. Gbur at an email address apparently associated with the Department of Health and Mental Hygiene. (*Id.* at 22.) The email includes on the "CC" line a total of 17 additional recipients, 13 of whom have "nyc.gov" email addresses

at either the Board of Corrections, the DOC, or the Department of Health and Mental Hygiene. (*Id.*) Berger also wrote to Juana Perez of the Department of Health and Mental Hygiene, once in September, and again in November 2007, requesting a release of certain of Fowler's medical records. (*Id.* at 9, 11.)

Plaintiff testified that despite his complaints of abuse, DOC officials that assaulted him continued on the job, and he continued to suffer abuse. In December 2007, Wilker sent emails on Fowler's behalf to individuals apparently on the Board of Corrections and at the DOC regarding Fowler's accessibility complaints, (i*d.* at 15), and again in August 2007 regarding Fowler's desire to contest certain infractions lodged against him and to speak with his attorney, (*id.* at 17-18).

In January 2008, Wilker emailed a contact named "OCC Staff" and an attorney named John Doyle III, regarding Fowler's complaint of being placed in a cell that was befouled with excrement by its prior occupant. (*Id.* at 19.) Wilker also emailed Dr. Gbur, Schall, and 20 others relaying Fowler's complaint that his wheelchair use had been discontinued. (*Id.* at 21.) In this email, Wilker indicates that Legal Aid was waiting for the recipients' "substantive response to [their] prior complaints on behalf of Mr. Fowler, which [was] requested

in October."[3] (*Id.*)  Wilker added that some recipients had acknowledged receiving an authorization by Fowler related to this request.  (*Id.*)

Through counsel, plaintiff then filed three complaints in New York State Supreme Court in Queens County between 2008 and 2009, alleging violations of his constitutional rights by the City of New York, the DOC, and a number of DOC officers and captains for events occurring in August and November 2007.  (*See generally*, ECF No. 65-2, Francola Decl., Ex. B.)  Fowler's complaint, signed February 22, 2008, details allegations of assaults and general mistreatment occurring in November 2007. (*Id.* at 4-5.)  His complaint, signed September 30, 2008, includes allegations pertaining to the alleged assaults taking place in August 2007.  (*Id.* at 12-13.)  And finally, Fowler's complaint signed February 5, 2009, also refers to some of the events Fowler alleges took place in November 2007 and generally brings cruel and unusual treatment claims.  (*Id.* at 20.)

## II.    April 2010 Incidents

Plaintiff was incarcerated on Rikers Island in April 2010.[4]  (Am. Compl. ¶ 4.)  Corrections officers allegedly transferred Fowler by bus on April 21, 2010 from the North

---

[3]    The papers submitted by plaintiff in this case include no requests or complaints made by Fowler or Legal Aid employees bearing an October date.
[4]    Whether plaintiff was released and reincarcerated in the interim is unclear from the record before the court.

Infirmary Command ("NIC") to the GRVC. (*Id.* ¶¶ 5-6.) Upon
reaching the GRVC, plaintiff expressed a desire not to be housed
there because he feared for his life, based on prior
mistreatment and assaults by DOC employees. (Fowler Dep. at 43-
44.) Fowler alleges that corrections officers boarded the bus,
that a female captain then struck him in the head with a radio
and ordered another officer to spray plaintiff with mace while
he was handcuffed. (Am. Compl. ¶¶ 8-9; Pl. Opp. at 3.) Then,
Fowler was allegedly put in a chokehold by a corrections officer
and assaulted by the female captain, (Am. Compl. ¶¶ 10-11),
during which time a DOC employee pressed an emergency response
button, (*id.* ¶ 12). Additional officers responded to the scene,
and an officer dragged Fowler off the bus. (*Id.*) Once outside
the bus, the responding officers allegedly began kicking and
punching plaintiff for five minutes. (*Id.* ¶¶ 12-13.) At the
conclusion of this assault, officers placed plaintiff in a cell
at GRVC, where he remained for 45 minutes before being taken by
ambulance to the hospital. (*Id.* ¶¶ 14-15.)

The following day, April 22, 2010, Fowler was brought
back to the GRVC from the hospital. (*Id.* ¶ 16.) He was using a
walking cane at this time. (*Id.* ¶ 18.) It is undisputed that
Captain Kenneth Blassingame and Officers Eric Harris and Andre
Phillip escorted Fowler to his cell and directed him to enter
it. (ECF No. 69, Def. Resp. to Pl. 56.1 Stmt. ¶ 6; ECF No. 72-

4, Phillip Dep. at 12.) It is also undisputed that at some point the officers and Fowler were standing outside his cell. (ECF No. 72-3, Harris Dep. at 14.) Officer Phillip stated during his deposition that Rikers Island security protocol requires officers to retain inmate canes when they return to their cells. (Phillip Dep. at 12.) The officers ordered Fowler to relinquish his cane, as did Captain Blassingame, but Fowler refused these orders according to Officer Phillip. (*Id.*) Fowler testified that he was threatened and that Officer Harris swiped Fowler's cane and pushed him to the floor. (Fowler Dep. at 57; Am. Compl. ¶¶ 17-18.) Both Officers Phillip and Harris stated in their deposition that Fowler twisted his body and pulled away from them, (Phillip Dep. at 13; Harris Dep. at 13), and then apparently fell or stumbled into the cell, (Phillip Dep. 14; ECF No. 72-6, Blassingame Dep. at 14). After a brief struggle, according to the officers, Fowler was sat down on his bed while still handcuffed. (Blassingame Dep. at 14-15.) Captain Blassingame ordered Fowler to move to a "cuff port" in his cell to have his cuffs removed. (*Id.*) Fowler apparently refused and Blassingame entered the cell to speak with Fowler. (*Id.* at 15.) Either Blassingame or another officer removed plaintiff's handcuffs, all officers exited the cell, and shut the cell door with plaintiff inside. (*Id.*; Harris Dep. at 14.)

Fowler disputes the officers' version of events, and

asserts that the officers tripped him and beat him for five to
ten minutes inside his cell. (Fowler Dep. at 59.)  The second
time the officers entered his cell, ostensibly to retrieve his
handcuffs, he was on the floor crying and in pain. (*Id.*)
Officers Harris and Phillip put their weight on Fowler's back or
neck by sitting on him while one of them pulled down Fowler's
pants and inserted a battery into his rectum. (*Id.*)  Captain
Blassingame and another female captain, according to Fowler,
stood outside and watched while this happened. (*Id.*)
Eventually, plaintiff was left alone in his cell, with the cuffs
removed and without a cane, and his cell door was closed. (*Id.*)
The following morning, officers sent Fowler for medical
treatment and it is undisputed that a battery was retrieved from
plaintiff's rectum by Rikers Island Urgent Care Services. (Def.
Resp. to Pl. 56.1 Stmt. ¶ 4; Fowler Dep. at 61-62; Blassingame
Dep. at 20.)

**LEGAL STANDARD**

### I.    Motion for Summary Judgment

Summary judgment shall be granted to a movant who
demonstrates "that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for
these purposes when it 'might affect the outcome of the suit
under the governing law.'"  *Rojas v. Roman Catholic Diocese of*

*Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). Thus, summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact. *Rojas*, 660 F.3d at 104. In deciding a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A moving party may indicate the absence of a factual dispute by, *inter alia*, "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

13

is no 'genuine issue for trial.'" *Matsushita Elec. Ind.*, 475 U.S. at 587.

Once the moving party has met its burden, "the nonmoving party may not rest upon mere conclusory allegations or denials." *Castro v. Cty. of Nassau*, 739 F. Supp. 2d 153, 165 (E.D.N.Y. 2010) (citing *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)). Rather, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In deciding a motion for summary judgment, the court is dutybound not to weigh evidence or assess the credibility of witnesses. *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).

**DISCUSSION**

**I.     Genuine Dispute of Material Facts**

Plaintiff makes much of several facts that remain unclear in this case arguing they are "area[s] of dispute that a jury must decide." (*See, e.g.*, Pl. Opp. at 7.) For instance, plaintiff notes that the ownership or origin of the battery allegedly used to sodomize him remains a fact in dispute. (*Id.*) Although the plaintiff's testimony and supporting medical records regarding the alleged assault and sodomy of plaintiff

with a battery is extremely troubling, it is not necessarily a material issue that will determine the outcome of his remaining *Monell* claim against the City. *Anderson*, 477 U.S. at 248.

Instead, plaintiff's claim appears to rely on the existence of unlawful practices of physical assault by subordinate and supervisory corrections officers at GRVC. These practices, according to plaintiff, were so permanent and well-settled as to constitute a "custom or usage," and were so manifest as to imply acquiescence of policymaking officials at the DOC and the City, who were notified by plaintiff and his representatives of the alleged assaults. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-30 (1988); *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992); *Jones v. Town of E. Haven*, 691 F.3d 72, 84 (2d Cir. 2012). In addition, plaintiff appears to rely on the City's purported failure to train or supervise DOC officers, amounting to deliberate indifference to the rights of individuals with whom the DOC employees will foreseeably interact. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

Defendant argues that plaintiff's efforts during discovery have not been fruitful for his *Monell* claim. (Def. Summ. J. Mot. at 2.) Plaintiff relies heavily on his own testimony, letters sent on his behalf to a number of City

employees, and lawsuits filed against the City of New York and
certain employees to establish the City's knowledge and
acquiescence in a custom or usage of violative assaults. Aside
from being insufficient for the reasons discussed below, the
court finds that these allegations include inconsistencies which
cast serious doubt on their plausibility. *See Aziz Zarif
Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998)
(Sotomayor, J) ("[I]n the context of summary judgment, . . .
when the facts alleged are so contradictory that doubt is cast
upon their plausibility, [the court may] 'pierce the veil of the
complaint's factual allegations,' dispose of 'some improbable
allegations,' and dismiss the claim."); *see also Jeffreys v.
City of New York*, 426 F.3d 549, 551 (2d Cir. 2005) (affirming
summary judgment for defendant where plaintiff relied almost
exclusively on his own testimony "replete with inconsistencies
and improbabilities").

First, as defendant notes, plaintiff's deposition
testimony is fairly characterized as vague as to the details of
the alleged 2007 assaults. (*See* Def. Summ. J. Mot. at 7; *see
also* Fowler Dep. at 12:23-15:13.) Of course, the court does not
fault plaintiff for faded memories of events that allegedly
occurred eight to eleven years ago, and the minor differences in
exact dates and failure to recall names are not what necessarily
undermine his claim. Instead, the inconsistencies in his

allegations in the lawsuits plaintiff commenced in 2008 and 2009 cast doubt as to whether plaintiff can sustain his claim.

For example, plaintiff's opposition references the August 23, 2007 assault by correction officers in which he was allegedly strapped to a gurney and beaten on the orders of Captain Matthews. (Pl. Opp. at 8.) This is supported by the September 19, 2007 letter from Berger to Deputy Commissioner White. (Ex. 7 at 5-6.) However, plaintiff's complaint filed in state court and seeking redress for the August 2007 incidents omits the fact of this alleged August 23, 2007 assault, instead stating only that plaintiff was "fastened to a gurney, and searched by Correction Officers." (Francola Decl., Ex. B at 13.) The 2007 complaint still alleges that plaintiff was subsequently dragged, carried, and dropped while returning to his cell, along with the earlier alleged August 13, 2007 assault. (*Id.* at 12-13.)

Two of plaintiff's other lawsuits include similar inconsistencies. His February 22, 2008 lawsuit alleging events occurring in November 2007 includes allegations that he was "restrained to a gurney and physically assaulted" by corrections officers on November 9 or 10, 2007. (Ex B. at 5.) However, plaintiff's February 5, 2009 lawsuit, alleging events occurring on or around November 8, 2007, does not refer to any subsequent assault involving a gurney. (*Id.* at 21.) Though it may be that

plaintiff chose not to include these specific allegations in any
of these state court complaints for strategic reasons, the
changing nature of his story, and the vagueness with which he
testified during his deposition, at the very least calls into
question the veracity of his allegations.  These inconsistencies
are not fatal to plaintiff's claims, but the court highlights
them for the sake of completeness.  In any event, the jury,
rather than the court, must assess the effect of inconsistencies
on a witness's credibility, and the court shall now consider
whether defendant is entitled to summary judgment as a matter of
law.

## II.     Municipal Liability

        Plaintiff brings very serious allegations of brutal
assaults by DOC officers and supervising captains employed by
the City of New York and assigned to GRVC on Rikers Island.
However, the court dismissed all the individual defendants in
this case due to plaintiff's failure to effect service of
process after numerous attempts, (ECF No. 36, Order dated Dec.
23, 2015), and only plaintiff's *Monell* claim against the City of
New York has proceeded.

        *Monell* extends liability under 42 U.S.C. § 1983 for a
municipal organization whose policies or customs lead to an
independent constitutional violation.  *Segal v. City of New
York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell v. Dep't*

*of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  However, a
municipality cannot be held vicariously liable under § 1983 for
the constitutional violations of its employees under a
*respondeat superior* theory.  *Monell*, 436 U.S. at 691; *Zahra v.
Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995).  To prove the
existence of a policy or custom under *Monell*, a plaintiff must
demonstrate either: (1) an official policy, endorsed by the
municipality; (2) actions taken by officials or policymakers
that caused the underlying constitutional violation; (3) a
widespread and persistent practice so manifest as to imply the
acquiescence of policymakers; or (4) a failure to train,
supervise or discipline officers amounting to deliberate
indifference to the rights of those citizens interacting with
the officers.  *Jones v. Westchester Cty.*, 182 F. Supp. 3d 134,
158 (S.D.N.Y. 2016).

Plaintiff's Amended Complaint initially brought his
*Monell* claim under a theory of defendant's "careless and
reckless hiring, negligent training and negligent retention" of
its employees by defendant City of New York.  (Am. Compl. at 4.)
In his opposition to the instant motion, plaintiff appears to
argue a failure to supervise or failure to adequately screen
theory.  (Pl. Opp. at 6-7.)  Defendant argues that plaintiff has
not adduced sufficient evidence during discovery to support any
of his theories of liability, and is instead left with his own

allegations of misconduct and past lawsuits. (Def. Summ. J. Mot. at 6.) These allegations and lawsuits, defendant argues, do not prove either the occurrence of any constitutional violations, let alone a pattern of such conduct, sufficient to put the City on notice. (*Id.* at 9, 11.) Finally, defendant argues that plaintiff offers no causal link between any alleged failure to discipline or train City employees and his injuries. (*Id.* at 10, 11.)

Plaintiff's opposition does not directly address either argument by defendant and instead responds by citing to *Ehrens v. Lutheran Church*, 385 F.3d 232 (2d Cir. 2004), a Second Circuit case applying New York law for claims of negligent hiring, training, and supervision by employers. (Pl. Opp. at 7.) He appears to argue that the City is responsible for either the negligent hiring, training, or supervision of Officers Harris and Phillip, and Captain Blassingame, which led to the alleged April 2010 assault. (*Id.*) Plaintiff also argues that the City "knew or should have known of" Officers Harris, Phillips, and Captain Blassingame's "propensity for the conduct which caused [plaintiff's] injury." (*Id.*) To support his "knew or should have known" theory, plaintiff points to five "nexuses" or "clusters of events"—instances of alleged abuse endured by plaintiff starting in late 2007, and documented through emails and letters sent to various individuals by advocates at Legal

Aid.  (*Id.* at 8-11.)

The first nexus is summarized in the September 19,
2007 letter from plaintiff's representative, Berger, to Deputy
Commissioner White and includes the August 2007 alleged assaults
on Fowler, a delay in his medical treatment for injuries
sustained during these assaults, and Fowler's fall after being
soaked by the sprinkler in his cell.  (*Id.* at 8.)  Nexus two
includes the November 2007 alleged assault on Fowler and a
denial of certain medical treatment because he was wheelchair-
bound and GRVC was not wheelchair accessible.  (*Id.* at 9.)
Added to these allegations is an assertion in a letter to Dr.
Gbur that Fowler was not receiving the proper dose of his anti-
seizure medication.  (*Id.*)  The third nexus focuses on Wilker's
August 27, 2007 letter concerning allegations that GRVC officers
falsified documents that kept Fowler from appearing in court and
brought false charges of fighting against him.  (*Id.*)  Nexus
four concerns Wilker's January 2, 2008 email to attorney John
Doyle complaining of Fowler's having been placed in a GRVC cell
that was soiled by a prior inmate.  (*Id.* at 10.)  This fourth
nexus also includes plaintiff's complaints of having been denied
the use of a wheelchair "without any reason being given."  (*Id.*)
The fifth and final nexus is described in Wilker's September 17,
2007 email to 22 individuals complaining of a denial of medical
care to Fowler by GRVC officers as a punitive measure.  (*Id.*)

Plaintiff appears to focus on the third and fourth theory of *Monell* liability. That is, plaintiff argues that the City knew or should have known of a widespread and persistent practice so manifest as to imply acquiescence of policy makers, and that officials knew or should have known that Fowler would be subject to the constitutionally repugnant treatment he allegedly received at the GRVC, but nevertheless failed to train, supervise or discipline officers amounting to deliberate indifference to plaintiff's rights. (*See* Pl. Opp. at 7.) As the court noted in its Order denying defendant's motion to dismiss, "plaintiff alleges the existence of a custom, practice, or policy by the City of ignoring its employees' abusive behavior at GRVC allowed the abusive behavior to continue, and caused his injury." (Order at 10.)

To support a failure to train theory, a plaintiff must show that the "municipality's failure to train its employees in a relevant respect . . . amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] came into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (second alteration in original) (quoting *Canton*, 489 U.S. at 388). Similarly, for a failure to supervise or discipline theory, plaintiffs must demonstrate that the municipality was "faced with a pattern of misconduct and d[id] nothing, compelling the conclusion that the local government

ha[d] acquiesced in or tacitly authorized its subordinates'
unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d
Cir. 2007) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S.
701, 737 (1989)); *see also Green v. City of New York*, 465 F.3d
65, 80 (2d Cir. 2006).

"'[D]eliberate indifference' is a stringent standard
of fault, requiring proof that a municipal actor disregarded a
known or obvious consequence of his action." *Connick*, 563 U.S.
at 61 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520
U.S. 397, 410 (1997)). "A showing of indifference to
[constitutional rights violations] would depend in part on a
showing that, upon receipt of a credible report of such abuse,
superiors took no investigative or corrective action." *Jones*,
691 F.3d at 84. Under either a failure to train or failure to
discipline theory, a plaintiff must also prove "the stringent
causation and culpability requirements set out in" *Canton*.
*Reynolds*, 506 F.3d at 192 (citing *Amnesty Am. v. Town of W.
Hartford*, 361 F.3d 113, 127 (2d Cir. 2004)); *see also Roe v.
City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) ("[A]
plaintiff must demonstrate that, through its deliberate conduct,
the municipality was the 'moving force' behind the alleged
injury.").

Upon a review of the record and the parties' papers,
the court agrees with defendant. The flaw in plaintiff's case

is the failure to present sufficient evidence to support his *Monell* claim.  He thus provides no evidentiary support from which a jury could find a widespread custom or usage under *Monell*, or find that defendant knew of but was deliberately indifferent to the risk that the rights of citizens who interacted with DOC officers would be violated in the case of plaintiff's alternate theories of failure to discipline or train.

### A.    Failure to Discipline or Supervise

Failure to supervise or discipline claims must demonstrate the municipality's deliberate indifference to the rights of citizens who will interact with the municipality's officers.  *Reynolds*, 506 F.3d at 192.  A plaintiff may establish a municipality's deliberate indifference by demonstrating "inaction such as the persistent failure to discipline subordinates who violate civil rights."  *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983); *see also Jones*, 691 F.3d at 82 (describing deliberate indifference by supervisors as giving line officers "the sense that they could engage in [constitutional violations] without risking appropriate disciplinary consequences").  However, isolated incidents are not enough to subject a municipality to liability.  *See, e.g.*, *Escobar v. City of New York*, 766 F. Supp. 2d 415, 421 (E.D.N.Y. 2011); *see also Davis v. City of New York*, 228 F. Supp. 2d 327,

346 (S.D.N.Y. 2002) ("[T]wo incidents of unconstitutional conduct by low level employees in a city agency with over 35,000 employees can never provide a reasonable basis for finding a *widespread* or *well-settled* custom." (emphasis in original)). The need for more or better supervision must be obvious. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Canton*, 489 U.S. at 390). Proof of a single incident is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, attributable to a municipal policymaker. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Repeated complaints of multiple civil rights violations by a plaintiff may support a finding that the need was obvious, but a plaintiff must also demonstrate that the complaints were "followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann*, 72 F.3d at 1049; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) (finding evidence permitted reasonable inference that City defendants' response to complaints of constitutional violations was "uninterested and superficial"). Irrespective of the validity of such complaints, "the very assertion of a number of such claims [may] put the City on notice that" its officers had committed constitutional

violations.  *Fiacco*, 783 F.2d at 328.  Here, plaintiff sets
forth five separate so-called "clusters" of violations.

But, "'the mere fact that the misconduct occurred in
the first place' does not support a municipal liability claim
absent evidence of the City's reaction to those claims."
*Demosthene v. City of New York*, No. 18-CV-1358, 2019 WL 181305,
at *10 (E.D.N.Y. Jan. 10, 2019) (quoting *Amnesty Am.*, 361 F.3d
at 130).  Here, plaintiff's allegations of physical assaults
would not provide a basis for the jury to infer that the City
acquiesced and failed to "forestall further incidents."  *Vann*,
72 F.3d at 1049.

In *Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir.
1986), the Second Circuit upheld a jury verdict against the City
of Rensselaer in a § 1983 action when the plaintiff presented
significant evidence of actual notice to both the Chief of
Police and mayor of at least seven complaints of police
misconduct.  *Fiacco*, 783 F.2d at 329.  The plaintiff's evidence
included the trial testimony of four complainants, and testimony
from the police chief himself as to his handling of complaints,
evidencing a meager response.  *Id.* at 330-31.  Moreover, the
evidence demonstrated that one of the officers involved in the
plaintiff's alleged constitutional violation was the subject of
three prior complaints, but was still promoted.  *Id.* at 330.

Similarly, in *Sorlucco v. N.Y.C. Police Dep't*, 971

F.2d 865 (2d Cir. 1992), a directed verdict for defendant City of New York was reversed by the Second Circuit. *Sorlucco*, 971 F.2d at 870. The court found that plaintiff had presented sufficient evidence at trial including certain statistical evidence that supported her claim of a constitutional violation, and the testimony of a former NYPD Lieutenant in the Internal Affairs Bureau that cast doubt on the efficacy of the City's response to the alleged misconduct in that case. *Id.*

Conversely, in *Alwan v. City of New York*, 311 F. Supp. 3d 570 (E.D.N.Y. 2018), the court granted summary judgment for defendants when, despite a number of complaints against the subject officers, the plaintiff could not offer evidence of a lack of response by the City. *Alwan v. City of New York*, 311 F. Supp. 3d 570, 584 (E.D.N.Y. 2018). The district court considered the disciplinary record of two officers who allegedly used excessive force on the plaintiff. *Id.* at 582-84. The court noted the number of civilian complaints and internal investigations raised against each officer, and considered only those which were similar to the alleged violations at issue. *Id.* One officer was the subject of at least eleven civilian complaints related to the use of force, abusive language, or discourtesy. *Id.* None of the complaints resulted in disciplinary action because the officer was either exonerated or the complaint unsubstantiated. *Id.* This same officer was also

the subject of three internal investigations and three domestic violence complaints, and a defendant in two civil rights suits. *Id.* at 583. Though the court noted this officer's record was likely sufficient to put the City on notice, it subsequently found that summary judgment was nevertheless appropriate because the plaintiff had failed to identify any complaints to which the City failed to respond. *Id.* at 584. The plaintiff therefore could not establish that the City's response to an officer's misconduct was all but meaningless. *Id.*

In his opposition to the City's motion for summary judgment, Fowler has failed to present sufficient evidence for a reasonable jury to find that the City was on notice of persistent and widespread constitutional violations, or complaints of the same, and that it was deliberately indifferent to these violations. First, although plaintiff has presented evidence, based on his testimony and contemporaneous complaints, that constitutional violations actually occurred in 2007 and 2010, he has not presented evidence that could permit a jury to find that the City was on notice and acquiesced in the practice of physical assaults against inmates. Second, plaintiff has not pointed to evidence concerning the City's response or lack of response to his complaints, and has not argued that the response was insufficient or amounted to deliberate indifference.

Plaintiff relies on his letters and lawsuits as

evidence that the alleged violations actually occurred.  His
letters detail a number of incidents separate and apart from his
claims of abuse, and appear to focus both on the abuse and
alleged lack of medical attention he received, and other
grievances not related to an excessive use of force.  But,
plaintiff's letters alone cannot support a finding that the City
was on notice.  *Toliver v. City of New York*, No. 10-CV-5803,
2012 U.S. Dist. LEXIS 171239, at *12 (S.D.N.Y. Dec. 3, 2012).
As the court held in *Toliver v. City of New York*, No. 10-CV-
5803, 2012 U.S. Dist. LEXIS 171239 (S.D.N.Y. Dec. 3, 2012), "the
mere existence" of plaintiff's "numerous letters and complaints
. . . addressed to supervisors at the GRVC facility" and
containing unsubstantiated allegations of abuse are "an
insufficient basis upon which to impute to the City a policy of
deliberate indifference to prisoner abuse."  *Id.*

 First, the respective titles and positions of the
recipients of plaintiff's letters of complaint are entirely
unclear from the substance and address information of the
letters and emails.  Second, though some of plaintiff's letters
and emails reference the August 2007 alleged assaults, they
focus primarily on Fowler's complaints related to his wheelchair
access and subsequent medical treatment, and are accordingly
addressed to a number of City Department of Health and Mental
Hygiene employees.  (*See* Ex. 7 at 15, 22-23.)  Other

correspondence refers to Fowler's complaints of not being permitted to go to a so-called writ court to challenge certain infractions lodged against him. (*Id.* at 17-18.) Only one letter including allegations of the August 2007 assaults is clearly addressed to a DOC senior official in its investigations unit, Deputy Commissioner White. (*Id.* at 5-6.) There is no response noted from Deputy Commissioner White or anyone on his behalf, and there is no follow-up to Deputy Commissioner White included in the record indicating he failed to respond.

Notwithstanding the factual void left by this correspondence, even if the letters or emails were actually sent to the Commissioner or Chief of the DOC, or even the Mayor of the City of New York, as in *Fiacco*, the court would find that the limited number of complaints, of the sort plaintiff brought, are not sufficient to establish an obvious need for municipal corrective action. Indeed, courts have previously entered summary judgment against plaintiffs who pointed to many more complaints than plaintiff does. *See, e.g.*, *Vasquez v. City of New York*, No. 11-CV-3024, 2013 U.S. Dist. LEXIS 144313, at *32-33 (E.D.N.Y. Sept. 30, 2013) (granting defendants summary judgment despite plaintiff's offer of eight complaints and two lawsuits brought against subject officer); *Alwan*, 311 F. Supp. 3d at 585; *see also Estate of Jaquez v. City of New York*, No. 10-CV-2881, 2014 U.S. Dist. LEXIS 81577, at *14-15 (S.D.N.Y.

June 6, 2014) (granting defendant's motion to dismiss when the
five allegations of lethal force plaintiff offered did not
"support a plausible inference that each of the five incidents
amounted, in fact, to deprivation of constitutional rights");
*Jones*, 691 F.3d at 82 (reversing judgment against municipality
where past-incident evidence offered at trial was
unsubstantiated, unrelated, and failed to establish notice).

Here, the five "clusters" of abuse that Fowler
identifies in his opposition include allegations of three
assaults by GRVC corrections officers.  The remainder of
plaintiff's clusters include his general complaints regarding
wheelchair accessibility and his medication, and allegations
that he was improperly charged with fighting, denied the ability
to challenge this infraction, left in a soaked and slippery
cell, and placed in a cell soiled with human waste from the
previous occupant.  (*See* Pl. Opp. at 8-10.)  Though these other
allegations are all potentially serious, they do not support
plaintiff's claim that the City was on notice of abusive
behavior.  Given the weight of authority in this Circuit
plaintiff's three unsubstantiated allegations, even if proven,
cannot establish that defendant knew of and acquiesced in the
alleged abusive treatment.

Moreover, plaintiff's letters do not demonstrate the
City's response such that the court could find it was inadequate

or practically meaningless.  First, there is very little evidence concerning the City's response to plaintiff's allegations of the 2007 assaults at all.  Plaintiff again can only point to the letters sent on his behalf but he does not indicate whether or what response he received.  Even still, one reply to plaintiff's letters indicates that at least one City unit investigated plaintiff's August 2007 allegations and found them to be unsubstantiated.  (Ex. 7 at 23.)  Plaintiff provides no evidence, and makes no argument, that the mentioned investigation was somehow inadequate.  *See Vasquez*, 2013 U.S. Dist. LEXIS 144313, at *32.

For the same reasons, citation to lawsuits, even dozens of similar lawsuits, is not enough without evidence of the City's response or evidence that the response was practically meaningless.  *See Outlaw v. City of Hartford*, No. 07-CV-1769, 2015 WL 1538230, at *10 (D. Conn. Apr. 6, 2015) (finding sixty-five lawsuits offered minimal probative value without evidence of "the outcome in each case, or whether and how thoroughly the complaints were investigated by the City"); *Ameduri v. Vill. of Frankfurt*, 10 F. Supp. 3d 320, 341 (N.D.N.Y. 2014) ("[C]itation to a few lawsuits involving claims of alleged excessive force is not probative of the existence of an underlying policy by a municipality."); *see also Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22-23 (2d Cir. 2012) ("[Plaintiff]

. . . offered no relevant or admissible evidence in support of his assertion that the City of New York had established a policy or custom of 'use of excessive and brutal physical force against inmates/detainees by correctional officers,' and he did not establish that the deprivation of his constitutional rights was caused by any such policy. [Plaintiff]'s citation to various lawsuits involving inmate claims for the excessive use of force is not probative of the existence of an underlying policy that could be relevant here.").  There is no evidence in the record concerning the outcome of plaintiff's lawsuits or whether the unconstitutional behavior alleged was ultimately proven.

Plaintiff has not proffered sufficient evidence for a jury to find that the City should have known about a widespread pattern of constitutional violations by its officers at GRVC. There is no evidence in the record to detail the DOC's general procedures for addressing complaints of officer misconduct.  *See Sarus v. Rotundo*, 831 F.2d 397, 401-02 (2d Cir. 1987) (reversing plaintiff's verdict where plaintiff presented no evidence as to the municipality's response to any prior incident of misconduct, no evidence that superior methods were in use in other police departments, and no expert testimony as to proper officer procedures); *cf*. *Vann*, 72 F.3d at 1050 (finding material issue of fact existed where plaintiff presented evidence of municipal department's general methods of dealing with misconduct and of

its responses specific to the involved officer).

Plaintiff has also entirely failed to offer the disciplinary records of any of the officers involved in either the 2007 alleged assaults or the 2010 alleged assaults. Thus, he cannot show that the officers involved in the 2007 incident were never disciplined, or if they were disciplined, that it was so inadequate as to demonstrate deliberate indifference. *See Alwan*, 311 F. Supp. 3d at 585. Additionally, he cannot show that the records of the officers involved in the alleged assaults should have put the City on notice that the officers were likely to violate Fowler's constitutional rights.[5]

For the foregoing reasons, plaintiff has not identified a genuine dispute of material fact, and his failure to supervise or discipline claim fails as a matter of law.

### B. Failure to Train

Plaintiff's opposition and Amended Complaint can be alternatively construed to raise a claim based on the City of New York's failure to train its corrections officers.

Like a failure to discipline claim, a municipal defendant's failure to train its employees may support a finding

---

[5] The Amended Complaint alleges that at least one officer involved in the 2010 assaults was also involved in the 2007 assaults, but the court can find no record evidence to support this allegation. (Am. Compl. ¶ 32.) Neither Officer Phillip nor Captain Blassingame was assigned to GRVC during the time of the August 2007 assaults. (Blassingame Dep. at 7; Phillip Dep. at 7.) And Officer Harris is not named in any of plaintiff's allegations concerning the 2007 assaults.

of deliberate indifference under *Monell*. *Canton*, 489 U.S. at
388-89. The Second Circuit has identified three requirements a
plaintiff must meet to prevail on a failure to train claim.
*Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).
First, the plaintiff must show that a policymaker knows "to a
moral certainty" that the municipality's employees will confront
a given situation. *Id*. (quoting *Canton*, 489 U.S. at 390 n.10).
Second, the plaintiff must show that the situation either
presents the employee with a difficult choice that would be made
easier through training or "that there [wa]s a history of
employees mishandling the situation." *Id.* The plaintiff must
finally show that "the wrong choice by the city employee will
frequently cause the deprivation of a citizen's constitutional
rights." *Id*. at 298; *see also Jenkins*, 478 F.3d at 94.

The Supreme Court has cautioned that municipal
liability under *Monell* is "at its most tenuous" under a failure
to train theory. *Connick*, 563 U.S. at 61. The lack of training
must make it "highly predictable" that municipal officers would
violate the constitutional rights of citizens. *Id.* at 71. It
is generally insufficient to identify a particular officer's
unsatisfactory training because "the officer's shortcomings may
have resulted from factors other than a faulty training
program." *Canton*, 489 U.S. at 390-91. Thus, "the existence of
a pattern of tortious conduct by inadequately trained employees

may tend to show that the lack of proper training," rather than a single instance of faulty training, caused the plaintiff's injury.  *Bryan Cty.*, 520 U.S. at 407; *see also Jenkins*, 478 F.3d at 95 ("A training program is not inadequate merely because a few of its graduates deviate from what they were taught.").  To prevail, a failure to train claim must, therefore, "identify a specific deficiency in the city's training program and establish that [the] deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Amnesty Am.*, 361 F.3d at 129); *see also Green*, 465 F.3d at 81 ("At the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program . . . .'").

In addition to identifying the particular weakness in a city's training program, a plaintiff must offer some proof that "[c]ity policymakers [were] on actual or constructive notice that a particular omission in their training program [would] cause[] city employees to violate citizens' constitutional rights" but nevertheless chose to retain the program.  *Connick*, 563 U.S. at 61.  Without actual notice the need must be "so obvious, and the inadequacy [of current practices] so likely to result in a deprivation of constitutional rights" before a fact-finder may find deliberate

indifference.  *Canton*, 489 U.S. at 390.  A plaintiff must then establish that, faced with this obvious need, the municipal defendant breached its duty to act by failing to make meaningful efforts to address the risk of harm to citizens.  *Reynolds*, 506 F.3d at 192.

An obvious need appears to be a high bar, given the stringent standards of *Monell*.  District courts in this Circuit have questioned whether a particular need was obvious in failure to train or discipline cases, even where plaintiffs could point to evidence of more than 200 use of force complaints analyzed in an Inspector General's report.  *See Alwan*, 311 F. Supp. 3d at 581 (collecting cases).  A New York City Police Department ("NYPD") Inspector General's report issued in 2015 documented more than 200 substantiated use of force complaints between 2010 and 2014.  *Id.*  Courts that have declined to impose *Monell* liability in light of this report noted, among other reasons, the small number of allegations when compared to the sheer size of the NYPD.  *Id*.

Here, plaintiff has failed to develop and present evidence pertaining to training programs for DOC officers by the City of New York.  He cannot and does not point to a specific deficiency in the City's relevant training programs.  *See Farrow v. City of Syracuse*, No. 12-CV-1401, 2014 WL 1311903, at *8 (N.D.N.Y. Mar. 31, 2014) ("Plaintiff has not adduced direct

evidence of the City's training policies in discovery and, therefore, his claim cannot survive summary judgment."); *Jenkins*, 478 F.3d at 95 (granting defendant's summary judgment motion where plaintiff failed to "identify procedural manuals or training guides" or "highlight a particular aspect of police training or supervision that was responsible" for the constitutional violation); c*f. Burch v. City of New York*, No. 11-CV-2841, 2016 WL 11430773, at *18 (E.D.N.Y. Apr. 22, 2016) ("[Plaintiff] has raised an issue of fact as to whether officers were adequately trained . . . [t]hrough the testimony of her expert witness . . . .").

Moreover, as with his other claims, Fowler has failed to demonstrate an underlying pattern of constitutional violations that would put the City on actual or constructive notice of the obvious risk of harm to its citizens without meaningful efforts by the City. As previously discussed, his lawsuits, letters, and otherwise unsupported allegations are insufficient to demonstrate a pattern that highlighted an obvious need. Even in the cases where plaintiffs have offered the NYPD Inspector General's report detailing hundreds of excessive force complaints over a period of years, courts have been reluctant to find a pattern sufficient to put the City on notice. *See Alwan*, 311 F. Supp. 3d at 583 (collecting cases); *see also Hanson v. City of New York*, No. 15-CV-1447, 2018 WL

1513632, at *21 (E.D.N.Y. Mar. 27, 2018).

Finally, plaintiff has failed to present or point the court to record evidence that would satisfy the required causation element of his *Monell* claim under this theory. *See Reynolds*, 506 F.3d at 192. As such, plaintiff has not identified or presented evidence of any genuine disputes of material facts regarding his failure to train claim, and the court finds that defendant is entitled to summary judgment on this claim as a matter of law.

### C.   Custom or Practice

Defendant acknowledges that, in addition to the already discussed deliberate indifference theories, plaintiff argues something of a "hybrid theory" that a practice of abuse at GRVC was so widespread and persistent as to amount to *de facto* policy under *Monell*. (*See* Def. Summ. J. Mot. at 6.) But, because plaintiff alleges only violations concerning himself, and only a handful of violations at that, he cannot support a finding of a widespread custom or usage necessary to impose municipal liability under *Monell*.

A custom or usage of constitutional violations under *Monell* "must be so manifest as to imply the constructive acquiescence" of senior policymakers. *Sorlucco*, 971 F.3d at 871; *see also Curry v. City of Syracuse*, 316 F.3d 324, 330 (2d Cir. 2003) ("Under *Monell*, a municipality may not be held liable

under § 1983 simply for the isolated unconstitutional acts of its employees." (internal quotation mark omitted)).  But, "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy or usage that would justify municipal liability." *Jones*, 691 F.3d at 81.  A court in this Circuit has defined "widespread" to mean that the unconstitutional acts in question are "common or prevalent throughout the [government body]," and "well-settled" to mean that the unconstitutional acts "have achieved permanent, or close to permanent, status." *Davis*, 228 F. Supp. 2d at 346 (finding two incidents of unconstitutional conduct insufficient to support a widespread or well-settled custom theory under *Monell*); *see also Rubio v. Cty. of Suffolk*, 328 F. App'x 36, 38 (2d Cir. 2009) ("[W]e agree with the District Court that 'a few violations by a small group of subordinate County employees with no policymaking authority [cannot] amount to the pervasive and widespread custom or practice necessary for municipal liability.'" (second alteration in original)).

     "There is no 'magic number' of instances of unconstitutional conduct that will suffice to permit the inference of a broader municipal policy of custom.'" *Calicchio v. Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 316 (E.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Norton v. Town*

*of Islip*, No. 12-CV-4463, 2016 WL 264930, at *7 (E.D.N.Y. Jan. 21, 2016)).  However, courts in this Circuit have found as many as four alleged constitutional violations insufficient to indicate a widespread practice.  *See, e.g.*, *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) ("This evidence falls far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability." (internal quotation marks omitted)).

Moreover, courts have routinely granted summary judgment against plaintiffs who bring only allegations of constitutional violations unique to them.  *See, e.g.*, *Wingate v. City of New York*, No. 14-CV-4063, 2018 WL 3863439, at *10 (E.D.N.Y Aug. 14, 2018) (finding an ongoing practice of interference with plaintiff's mail not necessarily a widespread practice); *Bradshaw v. City of New York*, No. 17-CV-1199, 2017 WL 6060781, at *9 (S.D.N.Y. Dec. 17, 2017) (noting that plaintiff pointed to no evidence "aside from his own allegedly unconstitutional treatment"); *see also Norton*, 2016 WL264930, at *8 (granting defendant municipality judgment on pleadings and noting complaint did not allege "that anyone other than Plaintiff has been subjected to unconstitutional searches" which does not "support an inference that there was a broader [municipal] policy or custom").

In *Toliver*, the court granted summary judgment to

defendants because the inmate-plaintiff's allegations of widespread abuse of other inmates were conclusory and supported by no evidentiary material or specific supporting facts. *Toliver*, 2012 U.S. Dist. LEXIS 171239, at *14. The plaintiff therefore only offered proof of constitutional violations as to himself, and had thus failed to proffer evidence from which a reasonable fact-finder could conclude that his injuries were the product of a municipal policy or custom under *Monell*. *Id.*

Because plaintiff's alleged constitutional violations concern only himself, coupled with the limited number of alleged violations he brings, as a matter of law he cannot establish a finding of widespread practice supporting a custom or usage theory under *Monell*. Thus, under a custom or usage theory, plaintiff's *Monell* claim also fails.

### D. Failure to Screen

Plaintiff cites to a Second Circuit case applying New York law for the tort of negligent hiring to argue that the City, as an employer, is liable for the tortious conduct of its employees. (Pl. Opp. at 7; *see also* Am. Compl. ¶ 33.) This argument is unavailing. When considering a *Monell* claim, the court does not also consider analogous tort law to determine when a municipality has violated the constitutional rights of its citizens, especially not when a body of Supreme Court and

Second Circuit case law provides the relevant authority.[6]  In any
event, plaintiff appears to argue that the City should have
known about its GRVC officers' propensity for constitutional
violations.  Liberally construing this argument as a failure to
screen, the court likewise finds that plaintiff has failed to
adduce sufficient evidence to survive summary judgment.

For a failure to screen claim, the plaintiff must
produce enough evidence from which a jury could find that, had
the municipality adequately screened an officer's application
materials, the risk of a constitutional violation would have
been a "plainly obvious consequence."  *Bryan Cty.*, 520 U.S. at
411.  Additionally, to support such a claim, the plaintiff must
demonstrate that the municipality's indifference was not to the
officer's application materials in general, but, once screened,
to the obvious risk that the officer would violate the
constitutional rights of a citizen.  *Id*.  The Supreme Court has
cautioned that municipal liability claims based on such a theory
must be sufficiently scrutinized because there is a particular
danger of such claims "collapsing into *respondeat superior*

---

[6]     The Amended Complaint alleges that the assaults "were committed . . .
while [the officers and captains] were acting in the course and general scope
of their employment," thus making defendant City of New York "liable for the
careless and reckless hiring, negligent training and negligent retention of
its employees."  (Am. Compl. ¶ 26; *but see* ¶ 33.)  Plaintiff now seems to
argue in opposing defendant's motion that the officers were not acting within
the scope of their employment in order to hold the City liable under *Ehrens.*
(Pl. Opp. at 7 ("Sodomozing an inmate is not an activity that is within the
scope of their employment.  Therefore, it is appropriate to survey the
analysis of *Ehrens*.").)

liability." *Id*. at 410. The Court, therefore, instructed district courts to "test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.*

Plaintiff cannot prevail on a failure to screen theory. He has developed no admissible evidence of the hiring history of any of the officers allegedly involved in his constitutional deprivations. He has likewise neither discovered nor offered any evidence related to the hiring practices in general of the City's DOC. There is no evidence from which a reasonable jury could find for plaintiff on his failure to screen theory; thus, there is no genuine dispute of material fact requiring a trial. To the extent plaintiff lodges his *Monell* claim on a failure to screen theory, it too fails and the court grants defendant's motion for summary judgment.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment for defendant, and close the case.

**SO ORDERED.**

DATED: Brooklyn, New York
      March 26, 2019

                                          /s/

                                   **Kiyo A. Matsumoto**
                                   United States District Judge